AUGUSTUS F. BOSCHE v. THE TOLEDO DISPLAY HORSE CO. ET AL.

1. DUTY OF PERSONS DEALING WITH THE OFFICERS OF A CORPORATION.

Persons dealing with officers of a corporation are only bound to know the legal power of the corporation to perform acts, they are not required to know that all the formalities required of the different officers in the performance of their duties have been observed.

2. RIGHT OF CORPORATION TO BORROW MONEY AND GIVE SECURITY FOR THE SAME.

A corporation in Ohio has a right to borrow money to pay its debts and to run its business, and it has a right to give a mortgage upon all the property it possesses to secure that loan.

3. VALIDITY OF CHATTEL MORTGAGE EXECUTED BY THE PRESIDENT AND SECRETARY OF THE CORPORATION.

Where a manufacturing corporation borrows money from a bank and executes to the bank its promissory note for the amount borrowed, which note was executed by the president and secretary of such corporation in their official capacity, and later the corporation, by its president and secretary, and under the seal of the corporation, executes to the bank a chattel mortgage upon its property to secure a new note for the amount of its entire indebtedness to the bank: *Held*, that such mortgage is valid and not given in fraud of creditors, and cannot be set aside by the general creditors but the bank shall be entitled to the money realized on it.

KING, J.

In this action certain creditors of the Toledo Display Horse Company—a corporation here—are seeking to have distributed to them in payment of their claims, certain funds in the hands of a receiver, and to prevent the application of the funds to the payment, as a preferred claim, of the debt of the First National Bank of Toledo. The claim of the bank arises in this way: On the 22d of June, 1894, the corporation known as the Toledo Horse Display Company was doing business in Toledo, in the course of which they borrowed one thousand dollars of the First National Bank and executed to the bank its promissory note for that sum promising to repay the money in ninety days with interest at eight per cent. per annum. This note was executed upon its face by the president and secretary of the defendant company, in their official capacities, and at the same time the president and the secretary individually endorsed the note upon its back. The money was procured and used by the corporation in its business and for its benefit. At the time the money was borrowed these officers of the corporation promised or agreed with the bank that, if required or asked for, they would give other and additional security upon the property of the concern. Nothing further, however, was done in reference to the loan at that time. The note matured on September 28, or thereabouts, and the matter ran along and the corporation became indebted to the bank, not only for this note and interest accrued thereon, but also on a small over-draft, so that on November 22, the debt amounted to $1,060, and on this day—November 22, 1894—the corporation, by its president and its secretary, and under the seal of the corporation, executed to the bank a chattel mortgage upon all of its property —at least all of its chattel property, and there is no evidence before us

Bosche v. The Toledo Display Horse Co., et al.

that it had any other property except its chattel property—which con-sisted of its stock in trade and the materials which it had on hand and which if was engaged in manufacturing into display horses. and perhaps other articles. This chattel mortgage on all of its property was executed and delivered to the bank, to secure a new note drawn up and executed on that day, by the president and secretary of the corporation for the amount of its entire indebtedness to the bank, viz: $1,060. This mort-gage was held and not filed for a few days, but it was filed with the re-corder of Lucas county, Ohio, on December 5, 1894, at 11:58 A. M. On the 4th of December the bank claimed that it took possession of this stock, by sending one of its clerks to the premises, and to him was de-livered, by the president of the corporation, the key of the storeroom in which most of the stock and material was located, and he held some sort of possession of this storeroom from that time, during the following day and until the forenoon of December 6, when he surrendered possession of all the stock and property which had been held for the bank, to a re-ceiver that had been appointed in this action on December 5. This ac-tion was commenced by the president, Mr. Augustus F. Bosche, on that day, as he says, for the reason that he feared trouble from attachment proceedings which had been on that day commenced and were pending before a justice of the peace in this city. The Display Horse Company had become insolvent. It was insolvent on the 22d of November, when it executed this chattel mortgage, and it remained in that condition and was insolvent on the day of the appointment of the receiver; but on the 22d of November, at the time of the execution of this chattel mortgage, we do not find that the officers of the company expected to suspend busi-ness, but, on the contrary, they expected to continue business. We find that the mortgage was given to the bank for the purpose of satisfying it, for the time being, so that they would commence no legal procedings against this company but would permit them to have further time to go on with their business. They did expect to carry on business for an in-definite time in the future and were continuing to carry it on up to the 5th of December, when, the president says, some cases were commenced against the company before a justice, and then he com-menced this action to have a receiver take charge of the business and wind it up.

The president and secretary executed this second note and mortgage without any consultation or meeting with any of the other directors. There were five directors, of whom the president and the secretary were two; the president's sister was one, and a Mr. Smith and Mr. Chapman. Mr. Smith was at the time of the execution of the chattel mortgage, traveling on the railroad somewhere, engaged in some business of his own, and was not in Toledo. He returned here after the giving of the note and chattel mortgage, was notified of it and agreed to it and never dissented from it. Mr. Chapman was in Toledo, but his attention was not called to it until after it was given, when he was notified of it, agreed to it and never dissented from it. In his examination he is finally of the opinion that his attention was not called to it until after the appointment of the receiver, but he is not certain of this. As it has been three years ago he is not at all certain that he learned of it before or after the ap-pointment of the receiver, but he says he learned of it shortly after it was given. Mr. Chapman is not very clear in his recollection on some other matters. For instance he thinks he never at-tended a meeting of the board of directors, while upon the record it

appeared that he had attended two or three of them, back in May, 1896, and by the records of the corporation it does not appear that after the month of May the board of directors ever had a meeting—no record was kept of meetings after May, 1894. It is fair to say that so far as Mr. Chapman is concerned, after May, 1894, he never gave the business of the corporation any attention, but it was managed by its president and secretary and Mr. Smith, who, when he was in Toledo, was consulted. Miss Bosche does not appear to have taken any active interest in the concern but was nominally a director having no management of it whatever, and, so far as the proof shows, she never was consulted about any of its business.

It is claimed here, that this mortgage should oe held—in the interests of the general creditors—void, for the reason that it was given in fraud of creditors, or was a preference made by this corporation which was actually insolvent, and that within the law as laid down in 46 O. S. it is absolutely void.

Upon that point, I may say that we do not think it comes within the doctrine as laid down in 46 O.S. it is substantially, in its facts and law, like the case of *Campbell* v. *Bellman Bros.*, 5 C. D. 389, which sustained as valid the conveyance there involved, and is within the doctrine as laid down in *Damerin & Co.* v. *Huron Iron Co.* 47 O. S., 581.

But is it void because it was not legally executed by its board of directors, or by any board of directors? An able argument is made here as to the powers and duties of the directors of a corporation, as to the necessity of their meeting and transacting their business as a whole body; that the minds of the directors should come together and that their assents should be given to any corporation acts, or to any that are necessary for its board of directors to perform as distinguished from those of the executive officers—the president, treasurer and secretary. In most all of the authorities the reasoning is applicable to a case where a threat of injury is made, or where the stockholders or non-attending directors are complaining that the business of the corporation has not been properly attended to by their agents; and, no doubt, any stockholder may well object to the violation of duty on the part of his agents in the management of the business of the corporation, whenever he is given an opportunity for that purpose. Or he may bring an action to have those who violate their duties as officers removed from office. And so may a state bring an action to oust a corporation from its franchises, as a corporation for the violation of its legal duties, but none of them, so far as I can ascertain, is applicable to this case, which is a mere contest between creditors claiming priority of payment out of the assets of a corporation. Persons dealing with officers of a corporation are only bound to know the legal power of the corporation to perform acts, they are not required to know that all the formalities required of the different officers in the performance of their duties have been observed. There is a clear and wide distinction between those two propositions. A coporation in Ohio has a right to borrow money to pay its debts and to run its business and it has a right to give a mortgage upon all the property it posesses, to secure that loan. It is necessary that the creditor should know that the corporation has the power to make a loan and to secure it by mortgage, but if satisfied himself of that authority, it is not the business of the creditor that he should know that the board of directors has had a meeting and that it passed a formal resolution that they are to borrow money or give security therefor, or that

the directors have been legally elected, or that the directors took an active interest or not. The creditor is not bound to know those things. He is dealing with a corporation which is a legal entity which the state has invested with the right to do things in its corporate name, through its officers, and through its officers alone. This doctrine is abundantly supported by authority, and I will cite two or three of the leading ones upon the subject. The case of *The Miner's Ditch Co.* v. *Zellerbach* and *Powers*, 37 Cal., 543, is a leading case. I will read from the syllabus, as the opinion is of great length.

"In a contract between a corporation and strangers dealing with it, when the act in question is one which the corporation has no power to perform under any circumstances, the corporation may avail itself of the defense of *ultra vires;* but when the act may be performed by the corporation for some purposes but not for others, the defense of *ultra vires* may or may not be available. If the stranger dealing with the corporation knew of its intention to perform the act for an unauthorized purpose, the defense is available, otherwise not.

"Where a deed purporting to be the deed of a corporation is signed by its trustees as trustees, and has the corporate seal affixed, it is admissible in evidence as a deed of the corporation, and is itself *prima facie* evidence of the regular and duly authorized execution of the same."

That is an interesting case. There is also a leading case found in 88 Eng. Com. Law. Rep., 337, in which the question is discussed.

The case of *C., H. & D. R. R. Co.* v. *Harter*, 26 O. S., 426, is in line with that as to the effect of a deed.

"A deed executed by the president of a railroad company in due form, under the seal of the corporation, and delivered, will be presumed to have been authorized by the directors; and the mere fact that such authority is not found on their minutes will not rebut this presumption."

In 5 Thompson on Corporations, under sections 597 and 598, many authorities will be found.

Now it is clear from these authorities that this corporation could not defend against a suit brought by the bank on the ground that it did not have the authority to make this loan, because the corporation did have authority to make it and to secure a loan made for business purposes, and the creditor is not bound to inquire into the purposes. If he has a full and distinct knowledge of what the purposes are, and if they are illegal, it might make a defense, otherwise not. But here the loan was entirely proper—was made for the uses of the corporation and was borrowed by the officers of the company upon the distinct promises that they would individually endorse it. They were not required to endorse the company's paper. It was without consideration moving to them. They could by their own acts and the consent of the bank, change that endorsement at any time they saw fit, or change to any other form of security. The loan was made to the corporation and the corporation was bound to secure it, if security was to be given, but there was no obligation, implied or otherwise, resting upon them that they should maintain the contract in the form in which it was originally made. The corporation having power to borrow money and power to give security, the executive officers could change the form of the security whenever they saw fit, and whether they did that with or without a meeting of the board of directors is a matter of no consequence, and the security cannot be taken from the bank because the board of directors did not meet. But, as a

matter of fact, every director who knew anything about it, agreed to this mortgage—consented to it. Shall it be held then that the general creditors may come in and set aside this mortgage which was given in good faith? It would be very hard to hold that to be law, and we think the bank should be entitled to this money; provided, however, that the receiver shall pay all the costs of this action before he distributes the proceeds of this property, and he can then pay the bank its claim so far as the proceeds go.

*I. N. Huntsberger,* Attorney for the Plaintiff.

*John Thurston, Wesley S. Thurstin,* and *E. W. Tolerton,* Attorneys for Defendants.